**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1290**

SAS INSTITUTE, INC.

        Plaintiff – Appellee,

v.

WORLD PROGRAMMING LIMITED,

        Defendant – Appellant,

**No. 19-1300**

SAS INSTITUTE, INC.,

        Plaintiff – Appellee,

v.

WORLD PROGRAMMING LIMITED,

        Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:10-cv-00025-FL)

Argued:  January 31, 2020                      Decided:  March 12, 2020

Before WILKINSON, AGEE, and THACKER, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Thacker joined.

_____

**ARGUED:** Jeffrey A. Lamken, MOLOLAMKEN LLP, Washington, D.C., for Appellant. Pressly McAuley Millen, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Michael G. Pattillo, Jr., James A. Barta, Caleb Hayes-Deats, MOLOLAMKEN LLP, Washington, D.C., for Appellant. Raymond M. Bennett, Samuel B. Hartzell, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellee.

_____

WILKINSON, Circuit Judge:

In this appeal, we affirm the district court's grant of two complementary injunctions issued pursuant to its All Writs Act authority. While we take the occasion to express our respect for the judicial system and judges of the United Kingdom, the district court here needed to ensure that a money judgment reached in an American court under American law—based on damages incurred in America—was not rendered meaningless. The court chose to enforce its judgment in the most measured terms, concentrating on the litigants' U.S. conduct and collection efforts. Failing to take even these modest steps would have encouraged any foreign company and country to undermine the finality of a U.S. judgment.

I.

Litigation between WPL and SAS, stemming from conduct dating back to 2003, has stretched on for over a decade. It has spanned courts in England, North Carolina, and California. Twice before, in 2012 and 2017, the parties have come before this court. *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370 (4th Cir. 2017) [hereinafter *SAS-2017*]; *SAS Inst., Inc. v. World Programming Ltd.*, 468 F. App'x 264 (4th Cir. 2012) (per curiam). Given this case's extensive history, only facts relevant to this appeal are set forth below.

A.

World Programming Limited (WPL), a U.K. company, and SAS Institute, a U.S. company, are software developers that compete in the market for statistical analysis software. Each company's software works by running applications that users have written in a computer programming language developed by SAS.

3

SAS has offered an integrated system of software products for decades. In 2003, newly formed WPL decided to launch a competing product, which it called "World Programming System" or "WPS." To aid development, WPL acquired copies of SAS software and studied how it functioned. Specifically, "[d]evelopers at WPL ran SAS programs through both [SAS software] and WPS, and then modified WPS's code to make the two achieve more similar outputs." *SAS-2017*, 874 F.3d at 376. When WPL installed the SAS software, it had clicked "Yes" to indicate it would comply with SAS's license agreement prohibiting "reverse engineering" and allowing only "non-production" use of the software. *Id.*

### B.

In September 2009, SAS filed suit against WPL in the U.K. High Court of Justice. SAS brought claims for breach of contract, based on WPL's alleged violation of its software license agreement, and for copyright infringement of its software. The U.K. High Court ruled in WPL's favor. It rejected SAS's copyright claim because, under the European Union Software Directive, functionalities of a computer program cannot be copyrighted. And, relying on the same Directive, it dismissed SAS's breach of contract claim because "a licensee is entitled . . . to determine the ideas and principles which underlie any element of the program" and any contrary license provisions are nullified. *SAS-2017*, 874 F.3d at 376-77; *see also* J.A. 382-83, 397. The Court of Appeal of England and Wales affirmed, and the U.K. judgment became final in July 2014.

In January 2010, several months after initiating the U.K. litigation, SAS filed suit against WPL in the Eastern District of North Carolina. As in the U.K. litigation, SAS

brought claims for breach of contract and copyright infringement. In addition, it asserted claims against WPL for fraudulent inducement in obtaining SAS software, tortious interference with contract, tortious interference with prospective business advantage, and violation of the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA). After cross-cutting motions for summary judgment, the trial court dismissed SAS's copyright and tortious interference claims but found WPL liable for breach of contract. Further, the court held that the U.K. litigation did not have a preclusive effect upon the U.S. litigation.

In September 2015, the U.S. litigation proceeded to trial on SAS's remaining claims for fraudulent inducement and violation of the UDTPA, and for the calculation of damages from WPL's breach of the license agreement. A jury found WPL guilty of both fraudulent inducement and violating the UDTPA. It awarded SAS compensatory damages of $26.4 million, which were trebled under the UDTPA, resulting in total damages of $79.1 million. The compensatory damage figure included both realized lost profits—based on specific U.S. customers who switched from SAS to WPL before trial—and expected lost future profits stemming from those same customers. The following year, the trial court denied a motion by SAS seeking a permanent injunction "barring the continuing marketing, selling, or licensing" of WPS "for use in the United States." J.A. 488-89 (quotation omitted).

Both parties appealed to this court. Relevant here, WPL appealed the trial court's holding that the U.S. litigation was not precluded by the U.K. litigation, while SAS appealed the court's denial of injunctive relief. We affirmed the trial court on these claims. We agreed that the U.K. litigation did not have a preclusive effect, given the "many legal

5

and factual differences between the U.K. litigation and the present [U.S.] suit." *SAS-2017*, 874 F.3d at 378-79.

In addition, we affirmed the trial court's denial of a permanent injunction. In doing so, we rejected SAS's concerns about the judgment's collectability as speculative. At that point, there was no reason to believe that a $79 million monetary judgment in SAS's favor was an inadequate remedy for harm suffered. We also expressed concern that the requested injunction would lower WPL's sales and thus "frustrate, rather than facilitate, [its] ability to pay damages." *SAS-2017*, 874 F.3d at 387.

C.

After this court's decision was handed down, SAS sought enforcement of the compensatory portion of the U.S. judgment in the U.K. WPL opposed enforcement and brought counterclaims under the United Kingdom Protection of Trading Interests Act (the "PTIA") to recover any sums SAS collected tied to non-compensatory damages.

Soon after SAS initiated the U.K. enforcement proceedings, it brought additional enforcement proceedings in the Central District of California. The California district court granted an order "providing for direct assignment to SAS of rights to payment from specified WPL customers located anywhere in the world, except in the United Kingdom, until [the U.S.] judgment is satisfied," (the "assignment order"). *SAS Inst., Inc. v. World Programming Ltd.*, No. 5:10-CV-25-FL, 2019 WL 1447472, at *2 (E.D.N.C. Mar. 18, 2019) [hereinafter *SAS-2019*]; *see also* J.A. 3135. WPL appealed the assignment order to the Ninth Circuit.

6

Meanwhile, SAS filed in California district court another motion for a new order obligating "WPL to turn over all income received from customers located worldwide, except in the United Kingdom," (the "turnover order"). *SAS-2019*, 2019 WL 1447472, at *3. The district court lacked jurisdiction to enter the order due to WPL's appeal, but stated it would do so if the Ninth Circuit allowed limited remand. SAS moved for limited remand, but, before the Ninth Circuit responded, a U.K. court issued a judgment in favor of WPL.

The U.K. court declined to enforce any portion of the U.S. judgment. Further, the court ordered that WPL could recover two-thirds of any amount it paid towards the U.S. judgment, corresponding to the non-compensatory portion of damages (the "U.K. clawback order"). Clawback could occur even though SAS had "not yet recovered more than the compensatory damages awarded." J.A. 1030.

The week after the U.K. court issued its judgment, it entered an anti-suit injunction requiring SAS to take certain actions in the United States but forbidding others (the "U.K. injunction"). For instance, the U.K. court ordered SAS to "take all reasonable steps" to prevent entry of the turnover order in California. J.A. 1035. It forbade SAS from seeking—in the United States—an anti-anti-suit injunction or similar relief designed to protect the U.S. judgment and the California collection proceedings. The injunction threatened criminal sanctions if SAS disobeyed:

### PENAL NOTICE

**IF YOU, SAS INSTITUTE INC., DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND YOU MAY BE FINED AND HAVE YOUR ASSETS SEIZED AND ANY OF YOUR DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES OR**

7

**AGENTS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

J.A. 1031. SAS stayed its motion to the Ninth Circuit to comply with the U.K. injunction.

In January 2019, soon after the U.K. injunction was issued, SAS filed an emergency motion for injunctive relief in the Eastern District of North Carolina. SAS requested that the district court enjoin WPL from licensing its software for use in the U.S. until monetary damages were paid. Alternatively, SAS requested a narrower injunction preventing WPL from licensing its software *to new customers* for use in the U.S. until the judgment was satisfied. The district court granted SAS's emergency motion and temporarily issued the narrower injunction prohibiting licensing to new customers.

WPL moved to have the injunction lifted. At a February 2019 hearing with the parties to discuss injunctive relief, the district court stated *sua sponte* that "no money collected in the United States or originating in the United States is subject to the claw back." J.A. 1238. Later that day, it reiterated in an order "that no sum previously collected or to be collected by [SAS] in the United States is subject to payment to [WPL] on the basis of the [PTIA]," (the "anti-clawback injunction"). J.A. 1184-85. Further, the court declined to lift the injunctive relief prohibiting WPL from licensing its product to new customers for U.S. use.

In March 2019, after an additional hearing, the district court issued a permanent injunction prohibiting WPL "from licensing WPS to any new customer for use within the United States," (the "U.S. expansion injunction"). *SAS-2019*, 2019 WL 1447472, at *18 (internal quotation marks omitted). This injunction would lift automatically once WPL

8

satisfied the money judgment. The court held that the All Writs Act (the "AWA") and Rule 60(b) of the Federal Rules of Civil Procedure provided alternate bases for its relief.[1]

Relying on the AWA, the district court found that—in light of WPL's actions in the English courts—the U.S. expansion injunction was necessary to protect the U.S. judgment. First, WPL's seeking the U.K. clawback order was an "affront" to the U.S. judgment, amounting to a collateral attack on the total monetary damage figure when SAS had not received "even a fraction of compensatory damages due." *SAS-2019*, 2019 WL 1447472, at *13. Second, the U.K. injunction obtained by WPL undermined enforcement of the U.S. judgment by "reach[ing] directly into proceedings in the United States" and "prevent[ing] SAS from seeking the full panoply of judgment collection tools" available. *Id.* at *10-11. Given WPL's actions, the court held that failing to provide injunctive relief would not "effectuate [its] judgment or promote the interests of justice." *Id.* at *14.

In its holding, the district court reiterated that the anti-clawback injunction remained in effect as necessary AWA relief that would "serve to enforce aspects of th[e] court's judgment and orders in favor of [SAS]." *SAS-2019*, 2019 WL 1447472, at *9. The grounds for this relief were similar to the grounds for the U.S. expansion injunction. The court noted WPL's attempts to frustrate its judgment by seeking U.K. clawbacks of U.S. collections, while simultaneously limiting SAS's ability to access the U.S. courts. Further, it found that

---

[1] Because we hold that the U.S. expansion injunction was authorized under the district court's AWA authority, we do not reach or discuss its alternate holding that Rule 60 provides grounds for relief.

WPL's actions conflicted with its earlier representation that it would hand over 100% of revenues from U.S.-based customers to SAS.

WPL appeals the district court's grant of the U.S. expansion injunction and anti-clawback injunction.

## II.

This court previously declined to issue an injunction impacting WPL's United States licensing, based on an expectation that WPL would devote some portion of its revenues to satisfaction of the U.S. judgment. *SAS-2017*, 874 F.3d at 386-88. In a way, we cut WPL a break; the absence of an injunction was intended to help WPL earn additional revenues from U.S. operations that it could use towards the judgment. Things did not go as planned. Since the case was last before this court, WPL has tried to evade, in every way and at every turn, using any revenues for satisfaction of the U.S. judgment. This left the district court with limited options—but options it needed to exercise in order to prevent its judgment from being rendered completely hollow.

## A.

The All Writs Act grants federal courts the authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Of particular relevance in the case at hand, a court may rely on the AWA to issue injunctions designed to prevent "collateral attack of its judgments," *In re March*, 988 F.2d 498, 500 (4th Cir. 1993), and "frustration of orders it has previously issued," *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977).

10

The rationale behind the AWA's broad grant of authority is clear. "[The AWA] is a codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099-1100 (11th Cir. 2004). If courts lacked the ability to enforce their judgments, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (quotation omitted).

B.

Despite a complicated procedural history stemming from years of litigation, the case before us is straightforward. WPL, a foreign company doing business in the United States, has attempted to evade a U.S. judgment. Instead of making a good-faith effort to pay up, WPL has repeatedly engaged in collateral attacks on the district court's judgment by calling upon the U.K. court system. So far, its tactics have been successful. To date, WPL has only paid a small fraction of the judgment, and it is attempting to undo even that much.

The district court could not allow WPL's evasion to continue. One need look no further than the extensiveness of WPL's attack on the U.S. judgment to see why the court's two injunctions were necessary.

Although founded in the U.K., WPL is a company "doing business in America" subject to "American law in American courts." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 940 (D.C. Cir. 1984). WPL violated North Carolina law by using SAS software to create a competing product in breach of a license agreement. A jury in North Carolina set compensatory damages at $26.4 million, based solely on harm SAS

11

incurred from lost U.S. customers and revenues. Under North Carolina law, these compensatory damages were trebled to total damages of $79.1 million.

After obtaining the U.S. judgment, SAS set about to collect on it—as it had every right to do. SAS commenced an enforcement action in the Central District of California and received the assignment order assigning to SAS "WPL's right to payments from" specified non-U.K. customers "until such a time as the North Carolina judgment in the amount of $79,129,905.00 is fully satisfied." J.A. 3135; *see also SAS-2019*, 2019 WL 1447472, at *2.

Unhappy with the pace of collections and possessing evidence to suggest that WPL instructed customers to disregard the assignment order, SAS moved for entry of the turnover order obligating WPL to deliver to SAS "all income received from customers located worldwide, except in the United Kingdom." *SAS-2019*, 2019 WL 1447472, at *3. Rather than challenge SAS's efforts in the Ninth Circuit, WPL turned to the English courts and engaged in a two-pronged attack on the U.S. judgment.

First, WPL attacked the U.S. judgment by requesting to claw back two-thirds of SAS's collections—corresponding to the non-compensatory portion of damages. A U.K. court granted this relief under the PTIA, even though WPL had "not yet paid sums exceeding the value of the compensatory part of the [U.S.] judgment." J.A. 1026-30; *see also SAS-2019*, 2019 WL 1447472, at *4. By seeking and receiving the U.K. clawback order, WPL fundamentally altered the U.S. judgment. Practically speaking, WPL relitigated the U.S. damage amount, lowering it by two-thirds. What's more, SAS would need to collect the full $79 million to retain the $26 million in compensatory damages.

12

Second, WPL sought relief designed to interfere with the California collection proceedings. Its efforts were successful. A U.K. court granted an injunction preventing SAS from pursuing normal collection efforts "in this country, the country of origin of the judgment at issue." *SAS-2019*, 2019 WL 1447472, at \*11. The U.K. injunction forbade SAS from pursuing entry of the turnover order. It explicitly directed SAS not to file a brief with the Ninth Circuit due that very day. It limited SAS's ability to enforce aspects of the assignment order that WPL did not challenge. It broadly prohibited SAS from seeking an anti-anti-suit injunction or similar relief related to either the California or North Carolina proceedings. Finally, the U.K. injunction warned of criminal sanctions if SAS did not comply, a serious threat since SAS has around 637 employees in the U.K., J.A. 2715, and "none of those employees wants to go to jail," J.A. 1257.

The U.K. injunction's impact on U.S. collections was immediate. SAS's already slow collection efforts were halted in their tracks. In the three months before the U.K. injunction was issued, SAS collected $623,886 under the assignment order. J.A. 2311-12. Over the following two months, collections dropped to under $40,000. J.A. 2311-12. Despite WPL's initial representations that the decrease was due to slow sales during a "quiet period," J.A. 1210-11, 1237, the district court discovered that WPL "got almost $600,000 during that period and kept it," J.A. 2849-51. WPL had simply stopped paying "amounts subject to unchallenged portions of the California court's assignment order." *SAS-2019*, 2019 WL 1447472, at \*11.

As a result of the U.K. injunction, SAS was left with few options to collect on the U.S. judgment if WPL engaged in further evasive measures. As the district court noted:

13

Indeed, prior to filing of the instant motion and imposition of AWA relief by this court, with the UK injunction in place, SAS had at its disposal no mechanism to prevent WPL from transferring sums received from United States-based customers to accounts in the United Kingdom, from altering licensing terms to direct payments to accounts in the United Kingdom, from communicating directly with customers special instructions for transmitting payments, or from taking any other actions in the United Kingdom to avoid paying sums to SAS.

*SAS-2019*, 2019 WL 1447472, at *11.

The combined impact of WPL's actions was particularly destructive. The U.K. injunction undermined SAS's ability to enforce the U.S. judgment, while the U.K. clawback order attempted to undo SAS's limited collection success. At the time the district court issued its injunctions, SAS had collected $6 million, the majority of which came from one-time court ordered payments rather than normal collection efforts. J.A. 962-63, 1270-73.[2] While not a small amount, $6 million represents only a fraction of the $79 million judgment. The district court calculated that, if nothing changed, it would take 36 years for WPL to satisfy the $79 million judgment. J.A. 2916-17. Further, if two-thirds of collections were subject to clawback in the U.K., it would take SAS 36 years to recover compensatory damages alone.

While the description above may not cover the entirety of WPL's evasive efforts, it demonstrates the situation facing the district court. Collections had all but stopped and were

---

[2] WPL alleges that SAS has now collected $8 million of the judgment. Oral Argument Audio at 3:30-3:45, *SAS Inst., Inc. v. World Programming Ltd.*, Nos. 19-1290, 19-1300 (4th Cir. Jan. 31, 2020). Even if accurate, this updated figure does not alter our conclusion that the injunctions were, and are, sound. It still represents a small portion of the total damage figure, and it does not account for potential U.K. clawbacks. Further, to the extent collections have sped up in recent months, this seems primarily to indicate that the district court's injunctions are working as intended.

14

in danger of being undone. An immediate response was required, so the district court turned to the anti-clawback injunction and the U.S. expansion injunction. We examine each in turn.

III.

As noted above, the anti-clawback injunction provides that "no sum previously collected or to be collected by [SAS] in the United States is subject to payment to [WPL] on the basis of the [PTIA]." J.A. 1185. WPL argues that the anti-clawback injunction cannot stand because it exceeds the court's AWA authority, violates principles of comity, and suffers procedural flaws. We review the district court's issuance of this injunction for abuse of discretion. *In re March*, 988 F.2d 498, 499-500 (4th Cir. 1993). "A district court abuses its discretion if it relies on an error of law or a clearly erroneous factual finding." *SAS-2017*, 874 F.3d at 384 (quotation omitted). We conclude that no abuse of discretion occurred here. The anti-clawback injunction falls within the court's AWA authority, respects comity, and is procedurally sound.

A.

The district court was faced with a daunting situation: its judgment was under sustained collateral attack. WPL utilized the English courts to undermine SAS's ability to enforce the judgment in U.S. courts. It obtained authorization to claw back two-thirds of SAS's collections, effectively lowering the U.S. judgment and threatening to shift collections into reverse. Given this predicament, the district court was well within its rights to issue an injunction preventing U.K. clawbacks of U.S. collections. Consistent with the

15

court's AWA authority, the injunction protects SAS's ability "to collect the entire amount of the [U.S.] judgment." *SAS-2019*, 2019 WL 1447472, at *9.

Although WPL raises several objections to the district court's issuance of the anti-clawback injunction, none are persuasive. To start, WPL attempts to characterize the seminal case *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984), as mandating that U.S. courts tolerate PTIA clawbacks. *Laker Airways* requires no such thing. Although the court there acknowledged that U.K. courts could order repayment of non-compensatory damages under the PTIA, a factual truism, it did not address whether a U.S. court could issue an anti-clawback injunction in response. Crucially, the district court's anti-clawback injunction is consistent with *Laker Airways*' holding that injunctive relief is appropriate when faced with attempts "to frustrate the enforcement of American law in American courts against companies doing business in America." 731 F.2d at 940.

Relatedly, WPL argues that it did not relitigate, attack, or alter the district court's judgment by seeking clawbacks in the U.K., but rather "took independent action under a U.K. statute that created a counterclaim in the U.K." Appellant's Reply Br. at 26 (quotation omitted). This argument quickly falters. As an initial matter, it strains logic to characterize a proceeding as "separate and independent" of a previous proceeding when its sole purpose is "to vitiate" the previous judgment. *See Karaha Bodas Co., v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 122, 122 n.13 (2d Cir. 2007). The weakness of this argument is further underscored when the initial proceeding has not truly concluded because damages remain unpaid and, thus, the court has "an outstanding judgment to

16

protect." *See Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 368 (8th Cir. 2007). Such is the case here: by seeking U.K. clawbacks, WPL attempted to undo two-thirds of a U.S. judgment it was not yet close to satisfying. The district court needed to protect its outstanding judgment.

B.

Comity does not prevent the district court's grant of the anti-clawback injunction, despite WPL's arguments to the contrary. "We approach [this] claim[] seriously, recognizing that comity serves our international system like the mortar which cements together a brick house." *Laker Airways*, 731 F.2d at 937. Still, we recognize that "a domestic forum is not compelled to acquiesce in pre- or postjudgment conduct by litigants which frustrates the significant policies of the domestic forum." *Id.* at 915.

North Carolina, and the United States more generally, has a policy of allowing non-compensatory damages. North Carolina's UDTPA, which resulted in the trebled damages here, "has at least three major purposes":

> (1) to serve as an incentive for injured private individuals to ferret out fraudulent and deceptive trade practices, and by so doing, to assist the State in enforcing the act's prohibitions; (2) to provide a remedy for those injured by way of unfair and deceptive trade practices; and (3) to serve as a deterrent against future violations of the statute.

*Caldwell v. Smith*, 692 S.E.2d 483, 485 (2010) (quotation omitted). WPL undermined these policies when it used the English courts to impede U.S. collection efforts and obtain clawbacks of the largely unsatisfied U.S. judgment. "There never would have been any situation in which comity or forbearance would have become an issue if [WPL] had not gone into the English courts to generate interference with the American courts." *Laker*

17

*Airways*, 731 F.2d at 939-40. Because WPL's actions frustrated U.S. and North Carolina policies, comity did not require that the district court surrender enforcement of its judgment.

There is an irony here. Rather than the district court's anti-clawback injunction being an affront to comity, actions by WPL have shown a lack of respect for American courts and American law. "The conflict . . . we confront today has been precipitated by the attempts of another country to insulate its own business entities from the necessity of complying with legislation of our country designed to protect this country's domestic policies." *Laker Airways*, 731 F.2d at 955. Comity is not advanced when a foreign country condones an action brought solely to interfere with a final U.S. judgment. *See Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654-55 (2d Cir. 2004); *Laker Airways*, 731 F.2d at 930. Nor is comity advanced when one country enjoins legitimate collection efforts in another country.

In contrast, the district court showed great respect for comity, limiting the impact of its anti-clawback injunction to sums collected in the U.S.—"monies without <u>any nexus to any enforcement proceeding in the United Kingdom</u>." *SAS-2019*, 2019 WL 1447472, at *9. Comity does not advise against such measured relief.

## C.

WPL also argues that the anti-clawback injunction suffered procedural defects. We disagree. The district court complied with procedural requirements even when WPL's own actions made it difficult to do so.

18

Initially, WPL claims that it was not given the requisite "notice and an opportunity to be heard" before the district court issued the anti-clawback injunction *sua sponte* at a hearing. *See Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 819 (4th Cir. 2004). But the court issued the anti-clawback injunction *sua sponte* because, under the U.K. injunction, SAS was prevented "from seeking relief from [the district] court to preserve its ability to keep amounts collected under th[e] court's judgment." *SAS-2019*, 2019 WL 1447472, at *10.

We provide district courts with "broad discretion" to manage the timing of injunctive relief, "so long as the opposing party is given a reasonable opportunity, commensurate with the scarcity of time under the circumstances, to prepare a defense and advance reasons why the injunction should not issue." *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319-20 (4th Cir. 2000). Here, the district court went out of its way to comply with this requirement. It issued the anti-clawback injunction at a hearing scheduled to address injunctive relief—after extensive discussion on the U.K. clawback order. It set another hearing for the following month. At the second hearing, the court discussed the anti-clawback injunction with WPL in some detail; WPL argued against the injunction but the court declined to lift it. Given WPL's attempts to frustrate the court's judgment, it can hardly claim it was without notice that the court would act to protect that judgment.

IV.

A.

WPL next argues that the district court exceeded its AWA authority by issuing the U.S. expansion injunction. As noted above, the injunction provides that:

> WPL is HEREBY ENJOINED from licensing WPS to any new customer for use within the United States. . . . This injunction expires automatically once defendant / judgment debtor has satisfied the judgment in this case.

*SAS-2019*, 2019 WL 1447472, at \*18 (internal quotation marks omitted).

WPL alleges that "[t]he injunction . . . does not protect the money judgment this Court previously affirmed." Appellant's Opening Br. at 22. We disagree. Once again, we review the district court's grant of injunctive relief pursuant to its AWA authority for abuse of discretion. *In re March*, 988 F.2d 498, 499-500 (4th Cir. 1993). And once more, we conclude that no abuse of discretion occurred. After observing WPL's collateral attack and frustration of the U.S. judgment, the district court sensibly concluded that this injunction was necessary to incentivize WPL to satisfy, rather than evade, its judgment.

As noted, we earlier affirmed the district court's denial of injunctive relief tied to WPL's U.S. licensing, expressing concern that such relief would frustrate WPL's ability to pay the money judgment. *SAS-2017*, 874 F.3d at 387. WPL took no heed of our forbearance. It collaterally attacked the judgment by obtaining clawbacks in the U.K. It interfered with U.S. collection proceedings and avoided collection efforts "with impunity" because there was no mechanism short of the previously denied injunctive relief by which the judgment could be meaningfully satisfied. *SAS-2019*, 2019 WL 1447472, at \*11. Thus, the district court faced a very different situation than it did several years ago. Its concern was "no longer so much WPL's ability to pay damages but rather the conditions under which it will pay the damages." *Id.* at \*16.

To create the right payment conditions, the court issued the U.S. expansion injunction. The injunction discourages WPL's evasion of the U.S. judgment by ensuring

20

that its frustration strategies will no longer be painless. While WPL can continue licensing its software to existing customers for U.S. use, its U.S.-related operations cannot grow until the judgment is satisfied. People, and companies, respond to incentives. In the end, "there must be some degree of impact upon WPL's operations for [injunctive relief] to have any practical coercive effect . . . ." *SAS-2019*, 2019 WL 1447472, at \*14.

The U.S. expansion injunction is narrow and carefully tailored. It is not intended to put WPL out of business. It does not affect WPL's current customers. It guards against double recovery, since "damages attributable to WPL customers engaged after trial in this matter [were] not incorporated into the . . . damages awarded at trial." *SAS-2019*, 2019 WL 1447472, at \*16. It expires automatically once the U.S. judgment is satisfied. It does not foreclose the possibility of modification earlier if WPL makes good-faith payment efforts.

Moreover, consistent with "principles of international comity," the injunction "focuses on conduct in the United States and touching upon United States based transactions and commerce." *SAS-2019*, 2019 WL 1447472, at \*13. Namely, it addresses only licensing for use within the U.S. Finally, the injunction is consistent with the historical practice of allowing equitable relief necessary to protect "a creditor who had already obtained a [money] judgment." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319-21 (1999).

As for the necessity for the U.S. expansion injunction, the court below explained it well:

> Where WPL has removed most tools available under US collection law, and
> where the UK judgment and injunction persist, SAS must resort to its own

21

more extraordinary and coercive measures such as the instant injunction to compel relief from WPL.

*SAS-2019*, 2019 WL 1447472, at \*16. "The essence of equity jurisdiction has been the power of the Chancellor . . . to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Because WPL "left SAS with few choices for asserting relief," it is unsurprising that SAS sought, and the district court granted, one of the last remaining options. *SAS-2019*, 2019 WL 1447472, at \*12.

Failing to act would have left the district court looking helpless. The court was "bound to implement" the "strongly mandated legislative policies" of the U.S. and North Carolina. *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 916 (D.C. Cir. 1984). Had the court not granted relief, its judgment would have become virtually meaningless, leaving SAS dependent on WPL's "voluntary acquiescence" to paying. *SAS-2019*, 2019 WL 1447472, at \*14. The court rightly held that "voluntary cooperation . . ., all while [SAS] is severely restricted in the tools available to it to enforce this court's judgment," was no longer sufficient given WPL's evasive maneuvers. *Id.* The court did not abuse its discretion by issuing an injunction necessary to protect its judgment.

B.

The parties disagree on whether the U.S. expansion injunction, issued pursuant to the district court's AWA authority, must satisfy the four-factor test traditionally required for injunctive relief. While there is strong support for the view that these factors "are pertinent in assessing the propriety of any injunctive relief," including AWA relief, we

need not settle this issue at present. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). If the traditional equitable analysis applies, it is satisfied.

Under the traditional equitable analysis, a plaintiff seeking injunctive relief must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In the case at hand, SAS has met this burden.

We noted in our previous opinion that "[s]atisfying these four factors is a high bar." *SAS-2017*, 874 F.3d at 385. That remains the case. Injunctive relief "does not follow from success on the merits as a matter of course." *Id.* (quotation omitted). Rather, it is "a drastic and extraordinary remedy" that should be used only when "essential in order effectually to protect property rights against injuries otherwise irremediable." *Id.* (quotation omitted). That being said, the *eBay* factors must be interpreted in light of the context to which they apply.

Here, the backdrop is, to repeat, that of a party who when faced with a lawful judgment under North Carolina law rendered in the Eastern District of North Carolina addressing the wrongful actions of WPL in North Carolina, and more broadly the United States, determined to dig in and use every possible means to avoid paying the judgment. Further, in 2017, we upheld the district court's denial of broad injunctive relief barring WPL *from all licensing* for U.S. use *permanently*; the present U.S. expansion injunction

23

provides much narrower relief, impacting only licensing *to new customers* for U.S. use *while the money judgment is outstanding*. It is through the lens of WPL's determined effort to avoid the legal consequences stemming from the jury's verdict on its breach of contract and unfair trade practices claims, and the changed nature of the relief at issue, that we now apply the *eBay* criteria.

Viewed through this lens, SAS has demonstrated irreparable injury from WPL's actions. Although in possession of a $79 million judgment, SAS has been able to collect little. Collections to date represent only a fraction of the compensatory damage award, much less the total damage award. At their current pace, collection efforts will take decades. Because "the unsatisfiability of a money judgment can constitute irreparable injury," this first factor is satisfied. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990).

Second, SAS has shown that legal remedies, "such as monetary damages" alone, are inadequate. *eBay*, 547 U.S. at 391. When SAS was last before this court, it raised concerns about the U.S. judgment's collectability. While we noted that "[i]njunctions have . . . sometimes been deemed appropriate based on barriers to collectability after judgment," we determined that, at the time, "SAS ha[d] offered only vague concerns on this front." *SAS-2017*, 874 F.3d at 387.

That is no longer the case. When the district court granted the U.S. expansion injunction, it found that:

> [T]he court now knows that WPL has sought and will continue to seek to clawback two-thirds of every dollar SAS collects. Furthermore, there is no clearer "barrier to collectability" than the UK injunction that has forced SAS

24

under penalty of criminal contempt to bring a halt to judgment collection activity available in the California court.

*SAS-2019*, 2019 WL 1447472, at *16. We agree. Without injunctive relief incentivizing WPL to satisfy the judgment, SAS's money judgment would be rendered near "illusory." *See SAS-2017*, 874 F.3d at 387.

Third, the balance of hardships has shifted to support a grant of injunctive relief. Previously, we expressed concern that the broader injunction's impact on sales might prove ruinous for WPL, when the company would "already face significant hardship based on the monetary damages it owes." *SAS-2017*, 874 F.3d at 387-88. Now, the narrowly tailored injunction granted by the district court encourages WPL to satisfy the judgment, while limiting any negative sales impact by allowing the company to continue serving existing customers. Thus, harm to WPL is lessened and our concern that an injunction "would frustrate, rather than facilitate, WPL's ability to pay damages" is lessened as well. *Id.* at 387.

WPL suggests the injunction is unnecessarily harsh because it prevents global licensing to new customers, even ones located outside the U.S. However, this feature was necessary to prevent easy circumvention of the injunction. Without it, WPL could "structure its customer relationships, licensing agreements, and invoicing practices, to allow or encourage new . . . licensing to global businesses for use in the US," and thus "engage countless new global company customers to undertake new substantial use of WPS products in the United States, without falling under the restriction." *SAS-2019*, 2019 WL 1447472, at *14.

25

Fourth, "the public interest factor has changed in light of WPL's activities in securing the UK injunction and judgment." *SAS-2019*, 2019 WL 1447472, at *17. Previously, we held that "abstract rule of law concerns" could not justify the broad injunction given concrete harms WPL customers would face in changing software. *SAS-2017*, 874 F.3d at 388. Now, under the district court's narrow injunction, WPL's customers are unimpacted.

In contrast, rule of law concerns are no longer abstract. They "have become paramount" where:

> The ability of US courts to enforce their own laws and to allow litigants to pursue freely rights accorded to them under US law have been significantly eroded through WPL's conduct in seeking the UK injunction and clawback relief in the UK judgment.

*SAS-2019*, 2019 WL 1447472, at *17. WPL alleges that this injunction will harm competition, by giving potential customers one less option. While protecting competition is of vital interest, SAS has many competitors in "the market for software used to manage and analyze large and complex datasets." *SAS-2017*, 874 F.3d at 375; *see also* J.A. 1467. Thus, rule of law concerns predominate at present. The final equitable factor is satisfied.

When denying broad injunctive relief several years ago, we noted that "the future sometimes declines stubbornly to be prophesied." *SAS-2017*, 874 F.3d at 385. At the time, we did not know that WPL would undermine U.S. collection proceedings at every turn and seek clawbacks in the U.K. Now we do. These changes in circumstance have made equitable relief essential.

C.

26

WPL next turns to procedural complaints, arguing that this injunction is not authorized by Rule 69 of the Federal Rules of Civil Procedure or by North Carolina law. Rule 69 directs that a federal "money judgment is enforced by a writ of execution, unless the court directs otherwise," and that, generally speaking, "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). WPL alleges that no provision of North Carolina law authorizes this injunction.

As an initial matter, North Carolina law authorizes injunctive relief:

> When, during the litigation, it appears . . . that a party thereto is doing or threatens or is about to do, or is procuring or suffering some act to be done in violation of the rights of another party to the litigation respecting the subject of the action, and tending to render the judgment ineffectual.

N.C. Gen. Stat. § 1-485. Here, WPL's interference with collection proceedings which SAS had a legal right to pursue—and its collateral attack by seeking clawbacks of funds SAS had a right to collect—undermined the effectiveness of the U.S. judgment.

Even if North Carolina law did not speak to the propriety of injunctive relief, the U.S. expansion injunction is consistent with Supreme Court precedent. Rule 69 specifies that, "a federal statute governs [collection proceedings] to the extent it applies." Fed. R. Civ. P. 69(a)(1). The district court issued the U.S. expansion injunction pursuant to the AWA, a federal statute. And, the Court has held that the AWA affords courts residual authority to issue necessary writs so long as no "statute specifically addresses the particular issue at hand." *Pa. Bureau of Correction v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985).

The Court noted that, while the AWA "does not authorize [federal courts] to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate," it "empowers them *to fashion extraordinary remedies when the need arises*." *Pa. Bureau*, 474 U.S. at 43 (emphasis added). We are faced here with the need for an extraordinary remedy. SAS, a litigant holding a U.S. judgment, attempted collection in California following Rule 69 and state procedures. Soon after, WPL obtained an injunction preventing "SAS from seeking the full panoply of judgment collection tools" available there. *SAS-2019*, 2019 WL 1447472, at *10. In response to the "restraints that WPL has placed on SAS's ability to use the tools normally available . . . in United States courts, particularly in the California court[s]," SAS returned to North Carolina seeking the U.S. expansion injunction. *Id.* at *12.

Given these circumstances of WPL's own making, we cannot fault SAS or the district court for "resort[ing] to [their] own more extraordinary and coercive measures . . . to compel relief." *SAS-2019*, 2019 WL 1447472, at *16. After straightforward collection procedures were thwarted, the AWA and Rule 69 allowed for "extraordinary" relief. *See Pa. Bureau*, 474 U.S. at 43. Thus, the district court possessed authority to issue the U.S. expansion injunction.

V.

To recapitulate, WPL's main effort at frustration involved seeking an anti-suit injunction from the courts of the United Kingdom. The U.K. anti-suit injunction was not only an attempt to relitigate our holding that the original U.K. judgment, while effective in the U.K., had no preclusive effect upon a lawsuit brought under North Carolina law, given

28

the "many legal and factual differences" between the U.K. litigation and the U.S. suit. *SAS-2017*, 874 F.3d at 378-80. The post-judgment anti-suit injunction issued by U.K. courts would prevent SAS from utilizing the laws of this country to satisfy a judgment rendered by courts of this country. Specifically, the injunction disrupted SAS's collection proceedings in the federal courts of California and sought to stop those proceedings in their tracks.

The district court naturally took steps not to leave its judgment defenseless. The court's U.S. expansion injunction and anti-clawback injunction work in tandem. The former incentivizes WPL to satisfy the U.S. judgment, while the latter ensures that U.S. collections remain with SAS. WPL would prefer "to continue unfettered in licensing its product for use in the United States," all the while seeking clawbacks. *SAS-2019*, 2019 WL 1447472, at *14. In other words, WPL would like to have its cake and eat it too. It would like to operate in the U.S. but face limited consequences for its violations of U.S. law. To illustrate the fallacy of this position, it's helpful to recall how this case began—with WPL's breach of a license agreement.

SAS is "the world's largest privately-held software company." *SAS-2017*, 874 F.3d at 387. Since its formation in 1976, SAS has sought to improve its products, investing a sizable percentage of revenue into research and development. When WPL decided to offer a competing product, it took a short cut. In violation of a license agreement, WPL reverse engineered a SAS product to speed development of its own product. *See id.* at 376, 380-83. This is not the sort of "innovation" or "competition" encouraged by U.S. law. A federal

jury found WPL liable for this behavior in federal district court and set damages based solely on the breach's impact in the U.S. Now, WPL seeks to avoid paying even those.

The situation before us did not have to come about. WPL could have proceeded differently at many points. It could have developed its product without violating SAS's license agreement. Or it could have declined to enter the U.S. market. But WPL cannot participate in the U.S. market, violate U.S. law, and expect to avoid the consequences of its conduct. "A foreign corporation doing business within the United States reasonably expects that its United States operations will be regulated by United States law." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 923 (D.C. Cir. 1984). The district court did not abuse its discretion by issuing the injunctions in this case. To have done nothing would invite foreign litigants to undermine the finality of many an American judgment and foreign countries to doubt the very efficacy of American law.

For the foregoing reasons, the judgment is affirmed.

AFFIRMED