Filed 12/5/23  Marriage of Salkhi and Behroyan CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re the Marriage of ARASH SALKHI and NOOSHIN BEHROYAN. | |
| ARASH SALKHI, Appellant, v. NOOSHIN BEHROYAN, Respondent. | A165484 (Marin County Super. Ct. No. FL1500976) |

Appellant Arash Salkhi and his former wife, respondent Nooshin Behroyan, executed a marital settlement agreement (MSA) that was incorporated into the judgment of dissolution.  The MSA contains a provision requiring the parties, who are Iranian nationals, to cooperate with each other in obtaining an "Iranian divorce decree consistent with the terms of this agreement."

Salkhi appeals from a postjudgment order enforcing the MSA.  The order requires him to cooperate with Behroyan in obtaining an Iranian

1

divorce through a process that allows Iranian nationals residing in the United States to register their foreign divorce decree in Iran (the "consular divorce process"). The order also requires him to dismiss with prejudice a divorce action he claimed to have filed in Iran shortly after Behroyan requested his participation in the consular divorce process.

On appeal, he argues that the family court erred in ordering him to dismiss his Iranian divorce action and comply with the consular divorce process because the plain meaning of the term "Iranian divorce decree" as used in the MSA refers to a divorce decree issued in an Iranian marital proceeding. He also argues that he had no prior notice that the order might include a restraint on his prosecution of the Iranian divorce action. He further contends that the order requiring him to dismiss his Iranian divorce action was an improper antisuit injunction. Finally, he argues that the court erred in awarding Behroyan over $22,000 in sanctions pursuant to Family Code section 271 because the underlying injunctions were improper, and because she provided insufficient evidence of her claimed costs and fees. We reject these contentions and affirm.

## I. BACKGROUND

Salkhi and Behroyan were married in 2003 in Iran and later moved to California. They had two children during their marriage. In 2015, Salkhi filed a petition for dissolution in the Superior Court for Marin County.

The parties divorced in 2016. Salkhi's counsel prepared the judgment of dissolution incorporating the parties' MSA, which settled all issues concerning marital rights, including child custody and support, spousal support, and division of property. Both parties were represented by legal counsel in the preparation of the MSA and attested to the opportunity to adequately consult with legal counsel concerning their respective rights.

2

Both parties acknowledged receipt of preliminary declarations of disclosure and elected to waive final declarations of disclosure. With limited exceptions set forth in the MSA, the parties released each other "from any and all actions, suits, debts, claims, demands and obligations of any kind or nature, whether known or unknown, . . . that either of them ever had, now has or may have against the other upon or by reason of any matter, cause or thing up to the date of the execution of the Agreement."

In section 11 of the MSA, the parties warranted that they had disclosed in the MSA all property in their possession and that they did not gift or transfer any community property. The MSA states, "If it shall hereafter be determined by a court of competent jurisdiction that either party now possesses any community property not set forth in this Agreement, . . . each party covenants and agrees to pay to the other," one-half of the fair market value of the property as of the date the parties executed the MSA.

Section 27 of the MSA requires the parties to "cooperate with the other in obtaining an Iranian divorce decree consistent with the terms of this agreement." Section 21.12 of the agreement states that the MSA "resolves any and all claims or rights that either party may assert in any Iranian dissolution proceeding to establish an Iranian decree of divorce." The parties waived "the right to assert in any Iranian marital proceeding any request for money, property, support or asserting any other claim against the other in any such proceeding other than a claim to terminate marital status in Iran without any claims for money, support, property or fees." Section 25 of the MSA authorized the trial court to retain jurisdiction to supervise execution of documents required or reasonably necessary to carry out the terms of the MSA.

In 2019, the parties submitted a stipulated modification to the judgment which was also drafted by Salkhi's counsel. Paragraph 1 reiterated the parties' agreement that "Nooshin and Arash will both cooperate in the obtaining of an Iranian dissolution." Other terms of the amendment required Behroyan to cooperate with an audit of Salkhi's business and the execution of necessary documents related to assignment of Salkhi's business. The stipulation reiterated that it resolved all outstanding issues between the parties and that "any claims either party has against the other not addressed in this stipulation are waived and cannot be raised in any future proceeding."

In March 2022, Behroyan filed a request for order enforcing the provision in the MSA requiring the parties to cooperate with each other in obtaining an Iranian divorce decree (the RFO). She argued that Salkhi had "frustrated" her efforts to obtain an Iranian divorce through the consular divorce process. She said she could not visit her family in Iran until the Iranian divorce was finalized because she feared for her safety and freedom. Under Iranian law, Salkhi could prevent her from leaving Iran. Accordingly, she requested an order requiring Salkhi to participate in the consular divorce process and to pay her for the attorney fees and costs she incurred as a result of his failure to comply with the MSA pursuant to Family Code section 271.

Behroyan's declaration explained that the consular divorce process requires submitting the state divorce decree and a "finalization of divorce" form from the Iranian Embassy website to an authorized Iranian Islamic Center where a certified cleric would finalize the divorce. She said Salkhi initially cooperated with the process by signing the required documents but later failed to appear at the hearing with the cleric, telling her that he wanted to file a divorce action in Iran.

Attached to Behroyan's declaration was an e-mail she sent to the Islamic Educational Center of Orange County in early April 2021, requesting an appointment for her and Salkhi. Included with the e-mail was an "Islamic Divorce Contract" that was signed by both parties. The contract noted, "THIS DIVORCE CONTRACT IS AN ISLAMIC (RELIGIOUS) DIVORCE ONLY; IT IS NOT A CIVIL DIVORCE THAT IS RECOGNIZED IN THE STATE OF CALIFORNIA." Nearly a week later, she informed her attorney via e-mail that Salkhi "signed the form but refuses to attend the zoom meeting with the Imam (aka priest) . . . ." An e-mail Salkhi's counsel sent to Behroyan's counsel in December 2021 stated that Salkhi did not agree to proceed with divorce using the consular divorce process, as he was "not aware that he would be waiving all rights he has under Iranian law by utilizing that process, specifically the right to seek information regarding financial transactions in Iran."

The declaration of Amin Alemohammad, an Iranian attorney, confirmed that the consular divorce process was "sufficient to obtain an Iranian divorce decree." He clarified that once the parties obtained an "Islamic Divorce Certificate" from the cleric, the Iranian Consulate validates the divorce, and the state divorce decree is referred to the Iranian courts for "review and registration." His declaration listed the documents the parties must submit to the Iranian Consulate and the specific steps they must take to register the divorce in Iran. He further stated that "[i]n the event a new divorce case is filed, the court will disregard the judgment in Marin County and make rulings accordingly [sic] to Iranian law, where divorce laws favor men; Iranian Civil Code Article 1133 states that the rights to divorce are solely and strictly the rights of men."

5

In his responsive declaration, Salkhi stated that after Behroyan had informed him of her intent to obtain a "religious divorce" with the help of an Iranian attorney, he told her that he "had conducted [his] own research and would obtain an attorney in Iran and grant power to that attorney for the divorce." He emphasized that he was not seeking an award of money, property or support against Behroyan in the Iranian proceeding; he "merely wish[ed] to investigate whether any undivided property exists." He stated that a petition had been filed in Iran for divorce and his attorney was "making investigations on my behalf." He claimed that he had "good reason not to trust" Behroyan because she "emptied" the marital home of valuables and "secreted" property in a storage locker. He said that she had been withholding his passport and birth certificate and that his "right to investigate should not be taken away from [him] when it was [Behroyan] who delayed obtaining an Iranian divorce by withholding [his] Iranian documents for five years." He requested that the court sanction Behroyan under Family Code section 271.

Salkhi attached to his declaration "Judicial Correspondence" showing he applied for "the issuance of Certificate of Impossibility of Reconciliation - (Divorce)" in April 2022. The correspondence appears to be from "Public Civil Courts, Chamber 1" in the "City of Neka [¶] General Justice Department of Mazandaran District." Salkhi did not include evidence of his Iranian divorce petition, or how long the Iranian divorce process would take, or how Behroyan and he could "both" cooperate in securing a status-only Iranian divorce decree. Salkhi presented no evidence to show whether a divorce could be pursued simultaneously in an Iranian court and through the consular process, or whether Iranian courts even recognize a status-only divorce proceeding.

After a hearing, the court ordered the parties to comply with the procedures set forth in the Alemohammad declaration for the consular divorce process. The court further ordered Salkhi to dismiss the divorce action he filed in Iran with prejudice, finding that the action was his attempt to "do-over" the California dissolution in violation of the judgment incorporating the MSA. The court denied his request for sanctions and ordered him to pay Behroyan sanctions in the amount of $22,519 pursuant to Family Code section 271.

## II. DISCUSSION

Salkhi argues that the trial court's order enforcing the MSA was erroneous because the consular divorce process does not result in an "Iranian divorce decree," and therefore Behroyan's request that he comply with that process does not implicate his duty under the MSA to cooperate with her "in obtaining an Iranian divorce decree." Additionally, he claims that the order compelling him to dismiss his Iranian divorce action violated his due process rights by expanding the scope of the injunctive relief requested by Behroyan without adequate notice, and that the order constitutes an improper antisuit injunction. These contentions lack merit.

### A. *Behroyan's Expert's Declaration*

Before addressing the issue whether the MSA contemplates the consular divorce process, we first address Salkhi's argument that the trial court lacked evidence about the process because the declaration of Alemohammad, Behroyan's legal expert, did not comply with the attestation requirements under Code of Civil Procedure section 2015.5. That section provides that a declaration must state that it is "true under penalty of perjury." (Code Civ. Proc., § 2015.5.) The declaration must also state the "place of execution" in California or that the declaration under penalty of

7

perjury occurs "under the laws of the State of California." (*Id.*, § 2015.5, subds. (a), (b).)

The declaration of Alemohammad filed with Behroyan's RFO does not meet either requirement under Code of Civil Procedure section 2015.5. The court noted at the hearing that the declaration was not "under penalty of perjury." A couple of days later, Behroyan filed and served a notice of errata with an amended declaration from Alemohammad. Although the amended declaration states that it is under penalty of perjury, it still does not comply with Code of Civil Procedure section 2015.5 because it does not specify whether it was made under California law. (See *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 612 [declaration defective "absent an express facial link to California or its perjury laws"].)

However, as Behroyan has pointed out, Salkhi waived this argument by failing to object in the trial court. (See *Robinson v. Grossman* (1997) 57 Cal.App.4th 634, 648 [failure to object in the trial court on ground that declaration was not signed under penalty of perjury waives the issue]; *Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166, 1178, fn. 7, citing Cal. Rules of Court, rule 5.111(c) ["absent timely objection that a declaration does not meet content requirements, 'any objection will be considered waived, and the declaration may be considered as evidence' "].)

We do not agree with Salkhi's belated argument in his reply that objecting would have been futile based on the trial court's brief comment at the RFO hearing that the declaration was not "under penalty of perjury." The authority he relies on as support for his argument is distinguishable. In *City of Long Beach v. Farmers & Merchants Bank of Long Beach* (2000) 81 Cal.App.4th 780, defense counsel twice orally requested that the trial court rule on written evidentiary objections but the trial court neglected to do so.

(*Id.* at p. 784.) The appellate court concluded that the written evidentiary objections had been preserved for appellate review because "[i]t would have been a fruitless or idle act to have interposed a third oral request for rulings." (*Id.* at p. 785; see also *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1580 [party did not waive his evidentiary objections where he orally requested a ruling on them].)

Here, in contrast, the record does not reveal that Salkhi objected to either Alemohammad declaration on the ground that the declarations did not comply with Code of Civil Procedure section 2015.5. " 'To obtain reversal based on the erroneous admission of evidence, the record must show a timely objection making clear that specific ground.' " (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1066, disagreed with on another ground by *In re Marriage of Tamir* (2021) 72 Cal.App.5th 1068, 1080.) " 'Lack of such objection deprives the proponent of the evidence an opportunity to establish a better record or some alternative basis for admission.' " (*Oiye v. Fox, supra,* 211 Cal.App.4th at p. 1066.) Salkhi cites no authority stating that the court's recognition of a defect is enough to absolve him of the duty to make a specific and timely objection, particularly where Behroyan promptly attempted to cure the defect and no objection to the amended Alemohammad declaration was raised.

Although "[t]rial courts possess some inherent power to exclude objectionable evidence on their own motion, [] '[i]t has been suggested that this power should be *exercised only where the evidence is irrelevant*, unreliable, misleading, or prejudicial, and that relevant and useful evidence that is *merely incompetent* under technical exclusionary rules *ought to be received* in the absence of objection by counsel.' " (*Gonzalez v. Santa Clara County Dept. of Social Services* (2017) 9 Cal.App.5th 162, 173.) We therefore

conclude that Salkhi's reliance on the trial court's recognition of a technical defect in the first Alemohammad declaration was insufficient to preserve his evidentiary challenges to the declaration for appeal.

## B.    *The Trial Court Correctly Interpreted the MSA.*

As previously mentioned, section 27 of the MSA requires in relevant part that "[e]ach party shall cooperate with the other in obtaining an Iranian divorce decree consistent with the terms of this agreement."  Salkhi does not dispute that he failed to cooperate with Behroyan when she attempted to obtain an Iranian divorce through the consular divorce process.  He insists, however, that the court's order requiring him to comply with that process was contrary to the plain language of the MSA, because "Iran's recognition of a foreign religious divorce is not the same thing as an Iranian divorce decree." According to Salkhi, an "Iranian divorce decree" refers to a divorce decree issued by an Iranian court in a marital proceeding.[1]  Based on our de novo review of the MSA as a whole, we reach the same conclusion as the trial court that Behroyan's efforts to obtain an Iranian divorce through the consular divorce process triggered Salkhi's duty to cooperate under section 27 of the MSA.  (*In re Marriage of Rosenfeld & Gross* (2014) 225 Cal.App.4th 478, 488

---

[1] At oral argument, Salkhi's counsel further argued that if both the consular process and an Iranian marital proceeding were contemplated by the MSA, the trial court cannot order Salkhi to comply with one permissible process over the other.  Even if we were to consider this argument raised for the first time at oral argument, we explain in the following section why the trial court had a sufficient basis to conclude that Salkhi violated the MSA by filing his Iranian divorce action.

10

["because no extrinsic evidence was considered, we are not bound by the trial court's construction and interpret the terms of the MSA de novo"].)

Where, as here, the MSA was incorporated in the marital dissolution judgment, we apply the general rules of contract interpretation to construe the intent of the parties at the time they entered into the MSA. (*In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 501.) We determine the parties' intent from the plain language of the contract, the words being understood in their ordinary and popular sense (*id.* at p. 502), and the contract "may be explained by reference to the circumstances under which it was made, and the matter to which it relates" (Civ. Code, § 1647). And if an ambiguity exists after employing rules of construction, the ambiguity is construed against the drafter. (*Breathe Southern California v. American Lung Assn.* (2023) 88 Cal.App.5th 1172, 1182; Civ. Code, § 1654.)

In ascertaining whether the consular divorce process is contemplated by the MSA, we first observe that contrary to Salkhi's characterization, the process does not merely result in "Iran's recognition" of a "foreign religious divorce." The evidence shows that the consular divorce process allows Iranian nationals residing in the United States to obtain an "Iranian divorce." It requires the parties to acquire an "Islamic Divorce Certificate" from a certified cleric and submit the certificate and their state divorce decree to the Iranian Consulate, which then refers the matter to the Iranian courts "for review and registration." According to the Alemohammad declaration, this is "sufficient" to obtain an "Iranian divorce decree." Indeed, Salkhi admitted in the trial court that if the parties utilized the consular divorce process, he would be waiving "all rights he has under Iranian law . . . ." The trial court could reasonably infer from this evidence that the Iranian court's decision to recognize the foreign divorce decree is in effect an order of that

11

court that terminates the parties' marital status in Iran.  The question then is whether that decision constitutes an "Iranian divorce decree" as that term is used in the MSA.  We conclude it does.

Dictionary definitions of "decree" show that it can be broadly defined as "a judicial decision in a court of equity, admiralty, divorce, or probate" or "[a]ny court order" (Black's Law Dict. (11th ed. 2019) p. 516) or as "an order usu. having the force of law" (Webster's 9th New Collegiate Dict. (1989) p. 331, col. 2).  A decision from the Iranian courts that has the effect of legally terminating the parties' marital status in Iran falls squarely within this broad definition of "decree."

Moreover, in the context of the MSA as a whole, it is clear that the provision requiring each party to cooperate with the other in obtaining an Iranian divorce decree was not intended to be as limited as Salkhi suggests. (See *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688 [we must construe the language of a provision in context, "in view of the intended function of the provision and of the contract as a whole"].)  The stated purpose of the MSA was "to make a final and complete settlement of all rights and obligations between the parties, including all property rights and all rights and obligations concerning child custody, child support, spousal support, and attorneys' fees."  Notably, the MSA aims "to resolve and settle any rights or obligations that might arise in accordance with *procuring an Iranian divorce*." (Italics added.)  The parties further agreed that the MSA "resolves any and all claims or rights that either party may assert in any Iranian dissolution proceeding to establish an Iranian decree of divorce.  Both parties specifically waive the right to assert in any Iranian marital proceeding any request for money, property, support or asserting any other claim against the other in any such proceeding *other than a claim to*

12

*terminate marital status in Iran . . . .*" (Italics added.) Taken together, these provisions plainly show the parties' intent to resolve all claims regarding their marital rights in the California divorce action but allow either party to seek termination of their marital status in Iran.

Viewed in this context, the term "Iranian divorce decree" is not reasonably susceptible to Salkhi's restrictive interpretation. Such a construction would result in an extraordinarily unusual provision requiring the parties to initiate an entirely new divorce action in Iran if they wished to terminate their marital status despite the existence of a far simpler process to do so. (See *Sayble v. Feinman* (1978) 76 Cal.App.3d 509, 513 ["[W]here one construction would make a contract unusual and extraordinary and another construction, equally consistent with the language employed, would make it reasonable, fair, and just, the latter construction must prevail"]; *Beverly Hills Oil Co. v. Beverly Hills Unified School Dist.* (1968) 264 Cal.App.2d 603, 609, superseded by statute on other grounds as stated in *Chavez v. Zapata Ocean Resources, Inc.* (1984) 155 Cal.App.3d 115, 120 & fn. 3 ["A contract must receive such interpretation as will make it reasonable"].)

To be sure, the MSA contemplates that a party *might* pursue a dissolution proceeding in the Iranian courts, and, in accordance with the MSA's purpose to resolve all claims related to the parties' marital rights, it requires reimbursement for attorney fees and costs the other party incurred in defending against claims in that action. But in reading the MSA as a whole, the intended purpose of the provision requiring cooperation among the parties to obtain an Iranian divorce decree was to ensure that either party can terminate their marital status in Iran if they so desire. Even if there is any remaining uncertainty regarding the construction of the phrase "Iranian divorce decree" in the MSA, we would resolve the ambiguity against Salkhi,

13

as it was his counsel who drafted the MSA and the subsequent addendum. (See *Breathe Southern California v. American Lung Assn., supra*, 88 Cal.App.5th at p. 1182.)

Salkhi argues that even if we disagree that the term "Iranian divorce decree" refers to an order issued in an Iranian marital proceeding, the "ambiguity" in the MSA regarding the process the parties must use to obtain an Iranian divorce renders the agreement too indefinite for the remedy of specific performance. We disagree. " ' " 'The law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if they can be ascertained.' " ' " (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 349.) As we have explained, the MSA reveals an intent to ensure either party can achieve legal termination of their marital status in Iran and an agreement for *both* to cooperate to achieve that result. It is the end result, not the specific process used to obtain that result, that is material to the substance of the agreement. (See *Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 269 ["neither law nor equity requires that every term and condition of an agreement be set forth in the contract"].) Therefore, on its face, the MSA is sufficiently certain to enforce.

In sum, the trial court did not err in concluding that Behroyan's efforts to obtain an Iranian divorce through the consular divorce process triggered Salkhi's duty to cooperate under section 27 of the MSA, and the relevant provision in section 27 was sufficiently definite to enforce.

## C. *Substantial Evidence Supports the Trial Court's Findings.*

As previously mentioned, the trial court not only ordered Salkhi to comply with the consular divorce process, but it also ordered him to dismiss the separate divorce action he filed in Iran after finding that his "attempt at

14

a do-over of the California dissolution in Iran [was] in direct defiance of this court's order . . . ." Salkhi does not expressly argue that the order is unsupported by the record, but he insists that his Iranian divorce action is not a "do-over" of the California dissolution.[2] To the extent Salkhi is challenging the trial court's factual basis for the order requiring him to forego his Iranian divorce action in favor of the consular divorce process, we conclude the trial court's findings are supported by substantial evidence. (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780 [standard of review of court's factual findings].)

The record demonstrates that in March 2021, Behroyan explained the consular divorce process to Salkhi, but he did not comply with all required

_____

[2] Salkhi also spends much of his brief explaining why his Iranian divorce action does not violate the provision in the MSA prohibiting the parties from asserting any claim in an Iranian dissolution other than a claim for termination of marital status, even though he seeks to investigate whether Behroyan is hiding community assets in Iran. We need not decide the issue because, for the reasons explained below, we conclude the trial court's findings regarding his Iranian divorce action are supported by the record. In any event, we disagree with Salkhi that because the parties retained the right to request that the family court divide any community assets omitted from the MSA, he has the right to use the Iranian divorce action to investigate undisclosed assets. The right to discovery in an action is ordinarily tied to the claims being raised. (See *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1186 [" ' "Under the discovery statutes, information is discoverable if it is unprivileged and is either relevant to the subject matter of the action or reasonably calculated to reveal admissible evidence" ' "]; *Darbee v. Superior Court of San Mateo County* (1962) 208 Cal.App.2d 680, 688 ["The 'subject matter of the action' is the circumstances and facts out of which the cause of action arises"].) The parties expressly agreed in the MSA to waive their right to assert "any" claim in an Iranian divorce proceeding other than a claim for termination of marital status, including any claim for money or property. We therefore do not interpret the MSA as permitting the parties to seek discovery regarding community assets in an Iranian dissolution proceeding.

steps, and he claimed nearly a week later that he would be filing a divorce action in Iran. His purported reason for doing so was to investigate whether Behroyan was hiding community assets in Iran. However, the parties warranted in the MSA that they had disclosed all assets, and Salkhi's only basis for suspecting that undisclosed assets existed in Iran were certain actions Behroyan took during the divorce, nearly six years earlier.[3] He claimed in his declaration that the delay in filing the Iranian divorce action was due to Behroyan withholding his passport and birth certificate. The trial court apparently did not find Salkhi's explanation credible, as it concluded that his "position [was] untenable" because he could have filed an RFO regarding his documents and the undisclosed assets instead of waiting nearly six years "before making this allegation for the first time in defense of Wife's RFO." Moreover, Salkhi did not provide any evidence of the effect of the Iranian divorce filing and whether he can seek discovery in a status-only proceeding. Alemohammad, on the other hand, stated in his declaration that if a new divorce action was filed in Iran, the Iranian court would disregard the judgment and "make rulings accordingly [sic] to Iranian Law" under which "the rights to divorce are solely and strictly the rights of men." The trial court could have reasonably inferred from this evidence, the timing of Salkhi's divorce action, and the lack of a credible explanation for the delay in filing the action that Salkhi's intent was to thwart Behroyan's efforts to obtain an Iranian divorce so that he could relitigate his marital claims.

---

[3] Salkhi's counsel also claimed for the first time at the hearing that in the prior year, Salkhi ran into Behroyan's former employer, who told him that Behroyan had "bragged" about "pull[ing] a fast one in the divorce." The court implicitly did not credit this hearsay evidence. We will not second guess the court's credibility determinations. (See *Estate of Berger* (2023) 91 Cal.App.5th 1293, 1309.)

16

The court thus had a sufficient basis to conclude that Salkhi's Iranian divorce action violated the MSA because it was a pretext for Salkhi to avoid cooperating with Behroyan and to relitigate his marital claims. Accordingly, we affirm the court's findings to that effect.

**D.    *Order Compelling Salkhi to Dismiss His Iranian Divorce Action***

Salkhi makes two additional arguments regarding the propriety of the court's order requiring him to dismiss his Iranian divorce action. We consider and reject each in turn.

**1. *Due Process: Notice of Scope of Injunctive Relief***

Salkhi first asserts that Behroyan's RFO asked the court to compel him to comply with the consular divorce process, but the court "went further" by ordering him to dismiss his Iranian action. He argues that this expansion of the injunctive relief requested by Behroyan without notice violated the due process principle that a party must receive " ' "proper notice and an opportunity to defend." ' " (*Midway Venture LLC v. County of San Diego* (2021) 60 Cal.App.5th 58, 77.)

The record, however, demonstrates that Salkhi had ample notice of Behroyan's desire to enjoin him from proceeding with his divorce action in Iran. To begin with, Behroyan's RFO sought compliance with the provision in the MSA requiring cooperation in obtaining an Iranian divorce decree. Her RFO identified Salkhi's intent to file a divorce action in Iran as an issue, arguing that the action was barred by the MSA and "[was] likely a pretext and another stall." And her supporting evidence described the consequences of Salkhi filing a divorce case in Iran, namely that he would have the sole right to finalize the divorce. Salkhi's responsive declaration addressed those arguments and confirmed that he had, in fact, initiated a divorce action in Iran. In reply, Behroyan further explained why the court "must not enable

17

[Salkhi's] attempt to use Iranian courts to create nuisance." Then, prior to the hearing on the RFO, the court issued a tentative ruling that included an order compelling Salkhi to dismiss his Iranian divorce action.

We further observe that at the hearing, neither Salkhi nor his counsel objected to the tentative ruling on grounds of inadequate notice or requested a continuance. Instead, they presented substantive arguments as to why the court should allow Salkhi to proceed with the divorce action in Iran. Salkhi has therefore arguably waived his claim of inadequate notice. (See *Carlton v. Quint* (2000) 77 Cal.App.4th 690, 697; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881 [party who resided in Czechoslovakia and had not been given proper notice of dependency proceeding waived any defect in notice by subsequently appearing through counsel and making substantive arguments without objecting to jurisdiction].)

Thus, the record leaves no doubt Salkhi had sufficient notice that Behroyan's request to compel his compliance with the MSA included a restraint on his pursuit of a separate divorce action designed to delay or frustrate Behroyan's efforts to terminate their marital status in Iran. (See Code Civ. Proc., § 580 [courts are authorized to grant "any relief consistent with the case made by the complaint and embraced within the issue"]; *In re Marriage of O'Connell* (1992) 8 Cal.App.4th 565, 576 [finding that husband's "motion to reduce support put his life insurance in issue"].) The cases on which Salkhi relies are therefore inapposite because they hold only that an injunction granted *without* prior notice is void. (See, e.g., *Midway Venture LLC v. County of San Diego, supra*, 60 Cal.App.5th at p. 79; *Pacific Decision Sciences Corp. v. Superior Court* (2004) 121 Cal.App.4th 1100, 1110.)

## 2. *Propriety of Antisuit Injunction*

Salkhi next argues that the order requiring him to dismiss his Iranian action is an improper antisuit injunction.

An "antisuit" injunction restrains a party from pursuing an action in a court of a foreign jurisdiction. (*TSMC North America v. Semiconductor Manufacturing Internat. Corp.* (2008) 161 Cal.App.4th 581, 589–591 (*TSMC*).) Although California courts have a recognized power to issue an antisuit injunction to restrain a party from litigating an action in another state's courts, this power must be exercised " 'sparingly.' " (*Id.* at p. 589.) The leading case on the propriety of issuing an antisuit injunction is *Advanced Bionics Corp. v. Medtronic, Inc.* (2002) 29 Cal.4th 697 (*Advanced Bionics*).)

In *Advanced Bionics*, an employee for a Minnesota-based company signed, as a condition of employment, an agreement that contained a covenant not to compete and required that all claims regarding the agreement be decided under Minnesota law. (*Advanced Bionics, supra*, 29 Cal.4th at pp. 700–701.) After the employee resigned and accepted employment with a California company, the California employer filed a complaint for declaratory relief in a California court, alleging the noncompetition clause was void because it violated California law and public policy. (*Id.* at p. 701.) The Minnesota company then filed suit in Minnesota state court against the former employee and his new California employer for breach of contract and tortious interference. (*Id.* at pp. 701–702.) A California trial court issued a temporary restraining order (TRO) in the California lawsuit, compelling the Minnesota company not to undertake any litigation whatsoever, other than in the California action, to enforce its

19

covenant not to compete. (*Id.* at p. 702.) The Supreme Court ruled that the trial court had improperly issued the TRO. (*Id.* at p. 708.)

The Supreme Court explained that an antisuit injunction may be issued to prevent conflicts between California courts, but the situation becomes more difficult, and requires additional "judicial restraint," when a second case is filed in another state and each state's "sovereignty concerns" are implicated. (*Advanced Bionics, supra*, 29 Cal.4th at pp. 705–707.) "When the cases involve different states, as in the matter before us, judicial restraint takes on a more fundamental importance." (*Id.* at p. 706.) The court cited with approval cases from other states holding a difference in substantive law is insufficient to justify an injunction prohibiting a party from litigating a proceeding in another state, as is the potential for inconsistent judgments. (*Id.* at pp. 705–706.)

The court also noted the importance of principles of comity when determining whether an antisuit injunction should be issued. (*Advanced Bionics, supra*, 29 Cal.4th at p. 707.) As the court explained, "[c]omity is based on the belief ' " 'that the laws of a state have no force, *proprio vigore,* beyond its territorial limits, but the laws of one state are frequently permitted by the courtesy of another to operate in the latter for the promotion of justice, where neither that state nor its citizens will suffer any inconvenience from the application of the foreign law.' " ' " (*Ibid.*) Therefore, comity "requires that we exercise our power to enjoin parties in a foreign court sparingly, in line with the policy of judicial restraint . . . ." (*Ibid.*)

The court held that "enjoining proceedings in another state requires an exceptional circumstance that outweighs the threat to judicial restraint and comity principles." (*Advanced Bionics, supra*, 29 Cal.4th at p. 708.) In the case before it, the court concluded that the circumstances did not provide

20

sufficient justification to warrant a TRO prohibiting the parties from pursing the Minnesota litigation.  (*Ibid.*)

In *TSMC, supra*, 161 Cal.App.4th 581, relied on by Salkhi, the trial court declined to issue an injunction enjoining a party to a trade secrets lawsuit in a California court from litigating a parallel proceeding in the People's Republic of China.  (*Id.* at p. 585.)  In affirming, Division 3 of this court rejected an argument that an antisuit injunction was needed to preserve a California company's constitutional rights of free speech and petition because there was no evidence that the Chinese court had taken, or had been asked to take, any action that was forbidden by the California Constitution or by the United States Constitution.  (*Id.* at pp. 592–593.)  The court also rejected an argument that an antisuit injunction was necessary to protect the California court's power and rulings, as there was no evidence of an attempt by the Chinese court to "carve out exclusive jurisdiction over the parties' disputes."  (*Id.* at p. 596.)  Finally, the court rejected arguments that an antisuit injunction was appropriate to protect California public policies and enforce contractual choice of law provisions.  (*Id.* at pp. 597–602.)

Assuming a divorce action has actually been filed in Iran based only on Salkhi's statement, Behroyan does not dispute that the order compelling Salkhi to dismiss his Iranian divorce action constitutes an antisuit injunction, but she contends that *TSMC* and *Advanced Bionics* are distinguishable because those actions involved similar claims proceeding simultaneously in different forums, whereas in this case, the California case reached judgment several years before Salkhi filed his divorce action in Iran. We agree that *Advanced Bionics* and *TSMC* are not exactly on point.  In concluding that no exceptional circumstances existed in the case before it, the *Advanced Bionics* court considered the sovereignty concerns present when

21

parallel actions proceed to judgment in two different states with concurrent jurisdiction. (*Advanced Bionics, supra*, 29 Cal.4th at p. 706, citing *Auerbach v. Frank* (D.C. Cir. 1996) 685 A.2d 404, 407.) "The fundamental rule is that, when concurrent jurisdiction exists, 'each forum is ordinarily free to proceed *to a judgment.*' " (*Auerbach v. Frank*, at p. 407, italics added.) We therefore determine whether and under what circumstances an antisuit injunction is proper where one of the two proceedings has reached judgment. As we will explain, we conclude that the trial court did not abuse its discretion by implicitly finding that Salkhi's use of the Iranian divorce action to impede Behroyan's efforts to enforce the MSA as incorporated into the California judgment constitutes an exceptional circumstance justifying an antisuit injunction preventing him from litigating his Iranian action.

### a. *Law Governing Antisuit Injunctions in Post-Judgment Proceedings*

The parties do not cite any, and we have not found any, California cases identifying the circumstances that would justify an antisuit injunction prohibiting a party from prosecuting an action in a foreign jurisdiction. Justice Moreno's concurring opinion in *Advanced Bionics* acknowledged the dearth of California authority on this point and attempted to describe the appropriate criteria for issuing antisuit injunctions. (*Advanced Bionics, supra*, 29 Cal.4th at pp. 710–711 (conc. opn. of Moreno, J.).) The concurrence relied on federal circuit court decisions in describing two approaches to antisuit injunctions. (*Id.* at pp. 712–714.) Under the "restrictive approach," which Justice Moreno favored, "courts should only issue antisuit injunctions in two situations: if 'necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of

the forum.' " (*Id.* at p. 714.) The concurrence emphasized that "circuits that follow the restrictive approach 'have interpreted these exceptions narrowly.' " (*Ibid.*)

The concurrence cited *Laker Airways, Ltd. v. Sabena, Belgian World Airlines* (D.C. Cir. 1984) 731 F.2d 909 (*Laker Airways*) as an example where an antisuit injunction was proper under the restrictive approach. (*Advanced Bionics, supra*, 29 Cal.4th at pp. 714–715 (conc. opn. of Moreno, J.).) There, a British airline filed an antitrust action in the District Court for the District of Columbia against several domestic and foreign defendants. (*Laker Airways*, at p. 915.) A few months later, one of the defendants filed suit in the United Kingdom seeking a declaratory judgment that no laws were violated and an injunction forbidding the airline from pursuing its antitrust action in the District of Columbia. (*Ibid.*) The United Kingdom court granted the injunction. (*Ibid.*) The airline thereafter sought an injunction in the District of Columbia court to prevent the remaining defendants from filing any action in a foreign court that would interfere with the District of Columbia court's jurisdiction, which the court granted. (*Ibid.*) The defendants appealed to the Court of Appeals for the District of Columbia. (*Ibid.*)

Applying the restrictive approach, the court of appeals affirmed the grant of the injunction on the ground that the English cause of action threatened its jurisdiction. (*Laker Airways, supra*, 731 F.2d at pp. 927–928.) The court acknowledged that neither duplication of parties and issues nor the possibility of an " 'embarrassing race to judgment' or potentially inconsistent adjudications" are alone sufficient to justify issuance of an antisuit injunction. (*Id.* at pp. 928–929.) However, it reasoned that "where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary

23

to avoid the possibility of losing validly invoked jurisdiction."[4]  (*Id.* at p. 930.) In the case before it, the court concluded that "the British and American actions [were] not parallel proceedings" because "the sole purpose of the English proceeding [was] to *terminate* the American action."  (*Ibid.*)

*Laker Airways* did not involve a judgment, but the court indicated that a post-judgment threat to the integrity of a domestic court's judgment is comparable to a pre-judgment threat to the domestic court's ongoing

---

[4] The *TSMC* court concluded that the *Advanced Bionics* majority "arguably" adopted a stricter standard than the federal courts' " 'restrictive approach.' "  (*TSMC, supra*, 161 Cal.App.4th at p. 596.)  "[A]lthough the trial court had found there was a substantial chance the defendant 'would "go to the Minnesota court [and] attempt to undercut the California court's jurisdiction" ' [citation omitted], the Supreme Court concluded no exceptional circumstance justified the order enjoining the Minnesota proceedings."  (*Ibid.*)  Thus, *TSMC* concluded, "the *Advanced Bionics* majority did not endorse the issuance of an antisuit injunction for a California court to protect its jurisdiction."  (*Ibid.*)  We note, however, that although the defendant in *Advanced Bionics* sought an order from the Minnesota court restraining the parties from litigating the California action, the preliminary injunction the Minnesota court ultimately issued did not prohibit the parties from prosecuting the California action and only enjoined the parties from seeking any relief that would restrain the Minnesota action.  (*Advanced Bionics, supra*, 29 Cal.4th at pp. 702–703.)  Therefore, by the time the plaintiff sought an antisuit injunction in the California action (*ibid.*), it was not a situation where "the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions . . . ."  (*Laker Airways, supra*, 731 F.2d at p. 930; see also *Gau Shan Co. Ltd. v. Bankers Trust Co.* (6th Cir. 1992) 956 F.2d 1349, 1356 ["we find nothing to indicate that the federal court's jurisdiction is threatened" because "Gau Shan offers no reason why this court should conclude that the Hong Kong courts would enter an antisuit injunction in this case"]; *Mutual Service Cas. Ins. Co. v. Frit Industries, Inc.* (M.D. Ala. 1992) 805 F.Supp. 919, 925 [finding that only a *limited* injunction preventing the party from seeking an antisuit injunction was justified where the foreign litigation was "being used in part to terminate the action before this court"].)

jurisdiction.  (*Laker Airways, supra*, 731 F.2d at pp. 927–928.)  "When the injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring parallel proceedings in matters subject to concurrent jurisdiction.  Thus, a court may freely protect the integrity of its judgment by preventing their evasion through vexatious or oppressive relitigation." (*Id.* at p. 928.)  The court further reasoned, "There is less justification for permitting a second action after a prior court has reached a judgment on the same issues." (*Id.* at p. 928, fn. 53.)  "Since res judicata and collateral estoppel may be pled in subsequent actions, a showing of harassment, bad faith, or other strong equitable circumstances should ordinarily be required." (*Id.* at p. 928, fn. 54.)

Citing *Laker Airways*, the Eleventh Circuit determined that the district court did not abuse its discretion in issuing a permanent injunction prohibiting an insurer from litigating the issue of whether it had a duty to defend its insured in the Isle of Man after the district court had entered judgment on the same issue.  (*Mutual Services Ins. Co. v. Frit Industries, Inc.* (11th Cir. 2004) 358 F.3d 1312, 1324–1325.)  "The district court was in the best position to know the history of the case and assess the strategic conduct of [the insurer] in seeking to relitigate the duty to defend issue in the Isle of Man litigation. In this case, the 'only conceivable benefit that [the foreign defendants] would reap if the district court's injunction were overturned would be the right to attack the pending United States action in a foreign court.' " (*Id.* at p. 1325.)

Similarly, in *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.* (2d Cir. 2002) 53 Fed. Appx. 597, the Second Circuit held that " 'a more lenient standard' [for issuing an antisuit injunction] prevails once judgment has been entered . . . ." (*Id.* at p. 598.)  The court affirmed the district court's ruling

25

enjoining a party from prosecuting a legal malpractice action against his former counsel in Canada after the district court had decided a dispute between them and awarded the latter its unpaid attorneys' fees. (*Ibid.*) "The district court evidently found that the litigation commenced in Canada is an effort to inflict expense on a prevailing party in order to discount, delay, avenge or otherwise frustrate the judgment entered in this case. Having reviewed the record, we cannot disagree with this finding." (*Ibid.*)

### b. Analysis

In determining whether exceptional circumstances exist that outweigh the threat to judicial restraint and principles of comity (*Advanced Bionics, supra*, 29 Cal.4th at p. 708) where one of two parallel proceedings has reached judgment, we find the *Laker Airways* line of cases instructive. Those cases concluded that comity considerations are less strong where the domestic court has rendered judgment on the merits because the foreign court "is usually obliged to respect" the judgment, and thus a more relaxed standard applies for the issuance of an antisuit injunction where judgment has been reached. (*Laker Airways, supra*, 731 F.2d at pp. 928–929 & fn. 53.) We agree, and we further conclude that the trial court did not abuse its discretion in issuing an antisuit injunction under the circumstances in this case.

California courts have long recognized that comity permits the application of res judicata and collateral estoppel to determine what can and cannot be litigated once the first suit is complete. (*Thomson v. Continental Ins. Co.* (1967) 66 Cal.2d 738, 746, fn. 4; *Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1475 [employing comity to give effect to a foreign judgment]; see also *Laker Airways, supra*, 731 F.2d at p. 939 ["Comity ordinarily requires that courts of a separate sovereign not interfere with

26

concurrent proceedings based on the same transitory claim, at least until a judgment is reached in one action, allowing res judicata to be pled in defense"].) Relying on federal authority, our high court held, "The doctrine of comity prescribes that a court of this nation recognize the judgment of a court of a foreign nation when the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 314.)

Although the issue in those cases was whether the domestic court should recognize a foreign judgment, comity is founded upon the principle of governmental reciprocity. (See *Biosense Webster, Inc. v. Superior Court* (2006) 135 Cal.App.4th 827, 837, citing *Mahan v. Gunther* (1996) 278 Ill.App.3d 1108, 1116–1117 ["While a court of equity has the power to restrain persons within its jurisdiction from instituting or proceeding with foreign actions, the exercise of such power is a matter of great delicacy and is to be invoked with great restraint in order to avoid distressing conflicts and reciprocal interference with jurisdiction"]; *Advanced Bionics, supra*, 29 Cal.4th at p. 707 [" ' " 'This courtesy, or comity, is established, not only from motives of respect for the laws and institutions of the foreign countries, but from considerations of mutual utility and advantage' " ' "]; see also *Laker Airways, supra*, 731 F.2d at p. 937 ["the central precept of comity teaches that . . . recognition [of foreign decisions] fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations"].) This principle would be undermined in most cases if a foreign court refused to recognize a domestic judgment that resolved issues raised in the foreign action between the same parties. Thus, it makes sense that comity is generally less of a concern and "there is little interference with the rule favoring parallel proceedings" when

27

there is a domestic judgment because of the expectation that a foreign court will respect the prior adjudication of the matter. (*Laker Airways, supra*, 731 F.2d at p. 928.)

*Laker Airways* suggests, however, that a judgment on the merits alone is insufficient to justify an antisuit injunction barring a party from litigating a foreign action. (*Laker Airways, supra*, 731 F.2d at p. 928, fn. 54.) This is because a "plea of res judicata was for [the] second forum, not [the] first forum, to determine." (*Ibid.*; see *Farrell Lines, Inc. v. Columbus Cello-Poly Corp.* (S.D.N.Y. 1997) 32 F.Supp.2d 118, 131 ["[A]lthough it is true that the foreign court should ideally determine whether a judgment in a domestic court precludes the foreign litigation, the standard for enjoining foreign litigation after the domestic court reaches judgment is lower"].)

Accordingly, to justify the issuance of an antisuit injunction in cases where the domestic action has reached judgment, federal courts have required a "convincing demonstration" that the purpose of the foreign action is to evade the judgment. (*Auerbach v. Frank, supra*, 685 A.2d at p. 409; *see Laker Airways, supra*, 731 F.2d at p. 928 ["a court may freely protect the integrity of its judgment by preventing their evasion through vexatious or oppressive relitigation"]; *Silva Run Worldwide Ltd. v. Gaming Lottery Corp., supra*, 53 Fed.Appx. at p. 598; *Farrell Lines, Inc. v. Columbus Cello-Poly Corp., supra*, 32 F.Supp.2d at p. 131.) Such "strong equitable circumstances" outweigh comity concerns (*Laker Airways*, at p. 928 & fn. 54) because "[c]omity is not advanced when a foreign country condones an action brought solely to interfere with a final [] judgment" (*SAS Institute, Inc. v. World Programming Limited* (4th Cir. 2020) 952 F.3d 513, 525). And where the reason for issuing an antisuit injunction is that a party is acting in bad faith in pursuing foreign litigation, there is little risk of "convey[ing] the message,

intended or not, that the issuing court has so little confidence in the foreign court's ability to adjudicate a given dispute fairly and efficiently that it is unwilling even to allow the possibility." (*Gau Shan Co., Ltd. V. Bankers Trust Co., supra,* 956 F.2d at p. 1355.)

Considering the foregoing, we agree that comity considerations are less strong where there is a domestic judgment, and that comity is not advanced when a foreign court allows a party to litigate an action brought solely to interfere with the judgment in a jurisdiction that will not apply res judicata. We therefore take into consideration the limited nature of the comity concerns present in this case as a result of the judgment in determining whether there is an "exceptional circumstance" that "outweighs" the threat to judicial restraint and principles of comity. (*Advanced Bionics, supra*, 29 Cal.4th at p. 708.) Under the *Advanced Bionics* standard, we conclude that the trial court did not abuse its discretion in issuing an antisuit injunction given the circumstances concerning Salkhi's divorce action in Iran.

Salkhi chose to litigate his marital claims in a California court. It was only after Behroyan sought to obtain an Iranian divorce decree through the consular procedure, nearly six years after judgment had been reached in the California action, that Salkhi initiated a divorce action in Iran. The trial court apparently found that Salkhi's intent in pursuing a new divorce action in Iran was to frustrate the California judgment. As previously discussed, we do not disagree with the trial court's findings based on the record before us. Moreover, allowing Salkhi to proceed with his separate divorce action cannot be reconciled with the MSA and the order compelling him to comply with the consular divorce process to obtain an Iranian divorce. The MSA prohibits the parties from bringing any claims in an Iranian proceeding other than a claim to terminate marital status. And the purpose of the relevant provisions in

29

the MSA is to allow either party to terminate their marital status in Iran, but the evidence suggests that as long as Salkhi pursues his Iranian divorce action, he alone has the right to finalize the divorce. In other words, the record indicates not only that Salkhi seeks to evade the California judgment through his Iranian divorce action, but also that an antisuit injunction is necessary to effectuate the MSA incorporated into the judgment. The exceptional circumstances of this case therefore outweigh the respect and deference ordinarily owed to independent foreign proceedings.[5]

While we are cognizant that an antisuit injunction is a matter of " 'great delicacy' " considering the principles of comity (*Biosense Webster, Inc. v. Superior Court, supra*,135 Cal.App.4th at p. 837), those "considerations of comity have diminished force" at the post-judgment stage (*Paramedics Electromedicina Comercial Ltda. v. GE Medical Systems Info. Tech., Inc.* (2d Cir. 2004) 369 F.3d 645, 654). Under the narrow circumstances of this case, the trial court did not abuse its discretion in issuing an antisuit injunction.

### E.    *Family Code Section 271 Sanctions*

Finally, Salkhi makes two arguments for why the trial court's Family Code section 271 sanctions order is erroneous. Again, his contentions fail.

---

[5] The declaration of Alemohammad clarifies that Iranian courts will not recognize a California judgment through res judicata. During oral argument, Appellant's counsel acknowledged there was no evidence in the record that Iranian courts would apply principles of res judicata, nor how long the Iranian divorce process could take to complete, but suggested that because the Iranian divorce decree would not be enforceable in California, there was somehow no injury to Respondent as she could seek attorneys' fees to punish Salkhi for his misconduct. Appellant's argument wholly ignores the equities, especially the inability of Behroyan to freely travel to and from Iran without Salkhi's ability to interfere.

### 1. *Basis for Awarding Sanctions*

Salkhi argues that we should vacate the Family Code section 271 sanctions award against him and direct the court to impose sanctions against Behroyan instead. He has not met his burden to establish error, however.

Family Code section 271 permits the court to "base an award of attorney's fees and costs on the extent to which any conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." Under this statute, and its identical predecessor, "[t]he trial court may . . . impose fees as sanctions against an intransigent party for the party's own conduct, or for the conduct of an unprofessional counsel." (*In re Marriage of Daniels* (1993) 19 Cal.App.4th 1102, 1107.) The court's decision to award attorney's fees and costs "will not be disturbed on appeal absent a clear showing of abuse of discretion." (*In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1318–1319.)

Salkhi's argument here is predicated on this court finding the trial court erred in granting injunctive relief. Because the MSA requires the parties to cooperate with each other in obtaining an Iranian divorce decree, and because we have concluded the trial court did not err in granting Behroyan's request for an order enforcing that provision of the MSA based on Salkhi's uncooperative conduct, his argument lacks merit. (See *Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 349 [Family Code section 271 sanctions proper where wife failed to comply with court order directing her to aid in transfer of title to real property to husband's name].)

## 2. *Amount of Award*

Salkhi also argues that Behroyan did not provide sufficient details from which the court could determine whether the attorney fees awarded were "reasonably necessary" and whether the $2,600 in alleged costs were compensable as Family Code section 271 sanctions. In response, Behroyan contends that because Salkhi never objected to the amount of her fee request or her supporting documentation in the trial court, he did not preserve his objections for appeal. We agree with Behroyan.

"[W]here the trial court is informed of the extent and nature of the services rendered, it may rely on its own experience and knowledge in determining their reasonable value." (*In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 300.) "Absent a request for a statement of decision as to how attorney fees were computed the complaining party has waived any failure to provide such a computation." (*In re Marriage of McQuoid* (1991) 9 Cal.App.4th 1353, 1361 [concluding that counsel's statements to the court that wife's total fee expense was $4,500 was "sufficient to establish the value of his services"]; see also *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1495–1496 [husband waived challenge to the amount of Family Code section 271 sanctions awarded to wife where he raised no objection in the trial court regarding the amount of attorney fees sought or the supporting documentation].)

Here, in support of Behroyan's request for Family Code section 271 sanctions, her counsel's declaration stated that his office spent 36.6 hours "on meeting and conferring with [Salkhi] to resolve the Iranian divorce issue and passport applications[] and bringing this motion" and that Behroyan incurred fees in the amount of $19,919 and costs in the amount of $2,600. This was sufficient to establish the value of the attorney services Behroyan received as

a result of Salkhi's uncooperative conduct.[6] (See *In re Marriage of McQuoid, supra,* 9 Cal.App.4th at p. 1361; see also *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 269 [" 'An attorney's testimony as to the number of hours worked is sufficient to support an award of attorney fees, even in the absence of detailed time records' "].)

While Salkhi requested a statement of decision, there is no evidence that he objected to the amount of the fee award. He also does not cite any portion of the record showing that he objected to the award of $2,600 in costs or to the evidence supporting Behroyan's claimed costs. " 'An appellate court will ordinarily not consider procedural defects or erroneous rulings . . . where an objection could have been, but was not, presented to the lower court by some appropriate method. [Citations.]' " (*In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002 [party waived claim that trial court improperly calculated the amount of child support by failing to raise the argument in the trial court].) The justification for this rule is that it is unfair to the trial court and the adverse party to permit a party to raise an alleged error that could easily have been corrected at trial. (*In re A.C.* (2017) 13 Cal.App.5th 661, 671.) Accordingly, we deem him to have waived any error regarding the amount of the Family Code section 271 sanctions award.

## III.   DISPOSITION

The order is affirmed. Respondent Nooshin Behroyan shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

---

[6] The cases Salkhi relies on are distinguishable because in those cases, no evidence whatsoever was presented to support the fee request (*In re Marriage of Duris & Urbany* (2011) 193 Cal.App.4th 510, 515), or the other party objected to the amount requested (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 869).

GETTY, J.*

WE CONCUR:


HUMES, P. J.


BANKE, J.


A165484N

---

* Judge of the Solano County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.